UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SUNEEL KOUL,

                        Plaintiff,

                                                                       <u>DECISION AND ORDER</u>

                                                                       14-CV-6428L

                        v.

UNIVERSITY OF ROCHESTER, et al.,

                        Defendants.
_____

**PRELIMINARY STATEMENT**

Plaintiff Suneel Koul ("Koul") commenced this action against defendants the University of Rochester (the "University") and Strong Memorial Hospital (the "Hospital")[1] alleging that the University unlawfully discriminated against him based his race and national origin. In the original complaint, Koul alleged claims for discrimination, racially hostile work environment, racially disparate treatment, and retaliation, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, New York State Human Rights Law Section 296, 42 U.S.C. § 1981, 42 U.S.C. § 1982, 42 U.S.C. § 1983, New York Labor Law § 740, as well as for tortious interference with an economic interest and breach of contract under state common law.

The University moved for summary judgment on all of Koul's claims, and on August 7, 2017, from the bench, and on the record, the Court granted the University's motion as to all of

---

[1] The Court accepts defendant's representation that the Hospital is not a separate legal entity from the University, despite the caption in this case. (Dkt. # 36-5 at 5 n.1). Therefore, for purposes of this Decision and Order, the Court will refer to the University and the Hospital as if they are one defendant.

Koul's claims except for the state-law breach of contract claim. (Dkt. # 46). In doing so, the Court dismissed the federal law claims that formed the basis for original jurisdiction. After additional briefing by the parties, (Dkt. ## 47; 48), the Court entered a decision and elected to exercise supplemental jurisdiction over the remaining state-law breach of contract claim, (Dkt. # 49).

Therefore, now pending is the University's motion for summary judgment regarding Koul's breach of contract claim—the only claim remaining from the original complaint. For the reasons stated more fully below, Koul's breach of contract claim is dismissed. The University's motion is granted and the complaint is dismissed in its entirety.

## BACKGROUND[2]

1. **Facts**

On March 1, 2005, Dr. Sandra Schneider ("Schneider"), Professor and Chair of the University's Department of Emergency Medicine, and Dr. David Guzick ("Guzick"), Dean of the University of Rochester School of Medicine and Dentistry, offered Koul a part-time clinical faculty position in the Hospital's Observation Unit and Emergency Department. (Dkt. # 40-1) (the "Offer Letter"). The two-page Offer Letter specified several aspects of Koul's faculty position, including: (1) clinical duties; (2) job performance evaluation; (3) compensation; (4) appointment duration; and (5) termination. (*Id.* at 1-2). Regarding the duration and termination of Koul's appointment, the Offer Letter stated:

> This agreement will continue for a one-year period. Termination of this agreement requires a minimum of 90-days written notice. However, this agreement will be terminated immediately if you lose your license to practice independently, lose you [sic] medical staff privileges of [sic] if you are suspended or terminated.

---

[2] The page numbers referenced in citations to the docket correspond to the page numbers assigned by CM/ECF upon filing.

(*Id.* at 2). Koul accepted the offer on March 7, 2005. (*Id.*).

Koul signed two additional documents on March 7, 2005. The first, entitled "Strong Memorial Hospital Statement of Assurances" (the "Statement"), provided that "[i]f [Koul's] application for membership and privileges [was] approved, [Koul] agree[d] to abide by the Bylaws of the Medical Staff, and the Rules, Regulations, and Policies of Strong Memorial Hospital, the University of Rochester, and of the Clinical Service(s) to which [he was] appointed." (Dkt. # 40-3). The second, entitled "Strong Health Credentialing Verification Office, Consent to Release of Information" (the "Release"), stated that "[b]y applying for appointment or reappointment to the medical staff of [the University], [Koul] acknowledge[d] that [he has] received and [has] the responsibility to read the medical staff bylaws and rules and regulations of each entity or panel of participants. [Koul] agree[d] to be bound by the terms of such documents and all other applicable policies of such entities as may from time to time be in effect[.]" (Dkt. # 40-4). Presumably, the Statement and the Release were documents that Koul needed to sign to accept the University's offer, yet Koul has not submitted any specific proof demonstrating this.

On May 26, 2005, Dr. Richard Burton ("Burton"), Senior Associate Dean for Academic Affairs at the University of Rochester School of Medicine and Dentistry, notified Koul that the University had approved his appointment as a part-time faculty member. (Dkt. # 40-6) (the "Appointment Letter"). Consistent with the Offer Letter, Koul's appointment was for a one-year term, effective June 6, 2005, through June 30, 2006. (*Id.*). Enclosed with the Appointment Letter was a copy of the University of Rochester School of Medicine and Dentistry Regulations of the Faculty (the "Regulations"), along with other materials pertinent to Koul's appointment.

3

(*Id.*). The Appointment Letter "recommend[ed] that [Koul] read these materials carefully and keep them for future reference." (*Id.*).

By the express terms of the Offer Letter and the Appointment Letter, neither guaranteed Koul employment at the University beyond his initial one-year term. However, his appointment was, pursuant to the Handbook, renewable, (Dkt. # 40-5 at 32), and the University chose to renew Koul's faculty appointment for several years, (Dkt. ## 36-1 at ¶ 11; 41 at ¶ 11). Each time the University made this decision, it would send Koul a short, two-paragraph reappointment letter. For example, on April 18, 2006, Burton notified Koul of Koul's "reappointment as Senior Instructor of Clinical Emergency Medicine (part-time), in the School of Medicine and Dentistry, effective July 1, 2006 through June 30, 2008. This action is based on the recommendation of the department chair and is in recognition of your contributions to the Medical Center." (Dkt. # 40-8 at 2). Koul has submitted nearly identical letters from the University dated March 10, 2008, reappointing him to a term effective July 1, 2008, through June 30, 2008, (*id.* at 3), and dated June 1, 2012, reappointing him to a term effective July 1, 2012, through June 30, 2013, (*id.* at 4) (collectively, the "Reappointment Letters").

However, things changed thereafter. By letter dated October 16, 2012, Dr. Michael Kamali ("Kamali"), who became Chair of the University's Department of Emergency Medicine in 2011, notified Koul that the University had "decided not to renew" Koul's appointment at the expiration of his term ending June 30, 2013. (Dkt. # 40-17) (the "Nonrenewal Letter"). The University made its decision "in part, due to concerns regarding [Koul's] compliance with University conflict of interest and conflict of commitment policies," (*id.*),[3] which stemmed from

---

[3] Koul submits the relevant policy, entitled "University of Rochester, Policy, Faculty Conflict of Commitment and Interest," as part of the University's Code of Conduct. (Dkt. # 40 at ¶ 48). It also appears that the Handbook incorporated this policy. (Dkt. # 40-5 at 45).

4

the University's belief that Koul was promoting his private urgent care business, of which he was the sole owner and director, to patients while working at the Hospital, (Dkt. ## 36-1 at ¶ 28; 41 at ¶ 28). This included taking phone calls related to his urgent care, handing out personal business cards, and comparing other local urgent care practices to his own. (*Id.* at ¶¶ 13, 16, 19). Kamali had previously documented these concerns in a letter to Koul dated September 25, 2012, (Dkt. ## 36-1 at ¶ 26; 41 at ¶ 26)[4], and had discussed them with Koul in prior meetings, specifically in 2011 and in September 2012, (Dkt. ## 36-1 at ¶¶ 16, 24, 26; 41 at ¶¶ 16, 24, 26). Koul disputes that he promoted his urgent care business to patients at the Hospital, and that his urgent care affected his responsibilities to the University.

In any event, the Nonrenewal Letter indicated that, pursuant to the Regulations, Koul was entitled to "a minimum of two (2) months notice of non-reappointment. This letter is to serve as the required notice. Specifically, this means your Faculty appointment and employment at the University of Rochester will end on June 30, 2013." (Dkt. # 40-17).[5]

Koul admits that he was not subjected to any disciplinary proceedings based on the University's concerns in the Nonrenewal Letter, and that he continued to work his regularly scheduled shifts through the end of his then-current term. (Dkt. ## 36-1 at ¶ 30; 41 at ¶ 30). Koul also admits that, given how the University chose to end his employment, he was not

---

[4] Kamali wrote to Koul on September 25, 2012, as a "formal follow" up to their "meeting on September 21, 2012. At this meeting [they] discussed [Koul's] recent actions in promoting [his] private business during University work time." (Dkt. # 40-9 at 2). In this letter, Kamali also asked for Koul's resignation based on Koul's actions. (*Id.*). Koul did not resign.

[5] The relevant provision of the Regulations states that, regarding part-time appointments: "No advanced notification is required if a reappointment is not recommended unless the faculty member is receiving a salary from the University. In the latter case, the faculty member should be notified two months in advance for each year in their current appointment. If the requisite notification is not given, the appointment will terminate in the appropriate number of months from actual notification depending on the length of the current appointment (e.g., two months from actual notification for a one-year appointment)." (Dkt. # 40-7 at 25). At the time Koul received the Nonrenewal Letter, he was serving a one-year term appointment. Therefore, he was entitled to two months' notice of the University's decision not to renew his appointment.

"terminated," (Dkt. ## 36-1 at ¶ 41; 41 at ¶ 41), and that the Nonrenewal Letter, therefore, provided him with eight months' notice prior to the expiration of his term, (Dkt. ## 36-1 at ¶ 40; 41 at ¶ 40), which was more notice than was required.

In December 2012, Koul met with Dr. Mark Taubman ("Taubman"), Chief Executive Officer of the University's medical center, and Dean of the University's School of Medicine and Dentistry, and complained about the University's decision not to renew his appointment. (Dkt. ## 36-1 at ¶ 31; 41 at ¶ 31). Koul maintains that he discussed concerns about workplace discrimination at this meeting, (Dkt. # 41 at ¶ 31), but Taubman says Koul never mentioned this, (Dkt. # 36-1 at ¶ 38).

In addition, in May 2013, Koul met with Raymond Mayewski ("Mayewski"), Chief Medical Officer at the University, in an effort to obtain a copy of a patient complaint letter that had been part of the basis for the University's concerns about Koul. (Dkt. ## 36-1 at ¶ 34; 41 at ¶ 34). Koul maintains that he asked for this letter several times, but the University failed to produce it. (Dkt. # 40 at ¶ 25). According to Koul, this prevented him from "from utilizing the letter in crafting his response/appeal of the decision to not reappoint him to his post at the [H]ospital." (*Id.* at ¶ 25 n.2).

Ultimately, Koul's employment at the University ended on June 30, 2013. On August 8, 2013, Koul sent a letter to Taubman stating, "It has been many months since I met you and reported the harassment and discrimination. During the meeting, you expressed understanding of my concerns and made assurances. Till date [sic], I have not heard from you[.]" (Dkt. # 36-4 at 86). On August 15, 2013, Taubman responded to Koul, indicating that he had "somewhat differing recollections of [their] discussion." (*Id.* at 88). Taubman stated, "At our December 12, 2012 meeting, you expressed dissatisfaction with Dr. Kamali's decision [not to reappoint Koul]

6

and informed me that you felt it was unfair. . . . At no time during our discussion did you ever state or otherwise indicate that you felt that you had been the victim of unlawful discrimination by Dr. Kamali." (*Id.*).

Thereafter, in September 2013, Koul filed a charge of discrimination based on race and national origin with the Equal Employment Opportunity Commission ("EEOC") against the University. (Dkt. # 36-4 at 97). On December 26, 2013, the EEOC issued a "Dismissal and Notice of Rights" regarding Koul's charges. (*Id.* at 114-115). Koul then filed a Summons and Notice in the Supreme Court of the State of New York State, County of Monroe, on March 25, 2015, (Dkt. # 1 at 6-7), and the Summons and Complaint on July 7, 2014, (*id.* at 13-21). The University timely removed the case to this Court on July 28, 2014. (Dkt. # 1).

2. **Arguments**

Although not specified in the Complaint, the record, specifically Koul's interrogatory responses, shows that the "contract" upon which Koul's claim is based is the Offer Letter, which was "renewed and/or amended" by the Appointment Letter and the Reappointment Letters. (Dkt. # 36-3 at 11-14). As clarified by counsel at oral argument, Koul's argument is that the terms of his employment agreement incorporated the internal policies and procedures outlined in, among other documents, the Handbook and Regulations. Thus, by allegedly failing to follow certain policies and procedures in the Handbook and Regulations while Koul was employed, the University breached its contract with Koul.

The violations alleged by Koul in the Complaint do not match those that he now claims preclude summary judgment. In the Complaint, Koul generally alleges that the University breached his contract by failing to follow its own regulations, failing to follow its disciplinary protocols and procedures, failing to follow its disciplinary policy, misconstruing its conflict of

7

interest policy, and misconstruing its conflict of commitment policy. (Dkt. # 1 at 19-20, ¶ 32). This caused Koul to suffer "severe emotional harm as well as economic damage to his professional reputation and business," for which Koul seeks compensatory and punitive damages. (*Id.* at ¶ 33).

Koul now argues, though, that the University did not adhere to different provisions of its internal documents. Specifically, according to Koul, the University did not: allow him to examine the patient's complaint letter in his personnel file; conduct a "formal hearing" after he "complained that the decision not to reappoint him was based on false evidence"; thoroughly consider his appeal of the University's decision; and investigate Koul's December 2012 discrimination claims. (Dkt. # 42 at 3). Furthermore, Koul argues, for the first time in his opposition to summary judgment, that the Handbook and Regulations, themselves, amount to an implied contract. (Dkt. # 42 at 1-2).[6]

The University acknowledges that Koul's employment "was governed by a written employment agreement," (Dkt. # 43 at 8), but argues, among other things, that Koul's claim for breach of contract based on the Handbook and Regulations is not judicially cognizable. (Dkt. ## 36-5 at 24-25; 43 at 6). In any event, the University asserts that it did not breach any of the terms at issue. (Dkt. ## 36-5 at 25-26; 43 at 7-13).

## DISCUSSION

1. **Legal Standard**

Summary judgment will be granted if the record demonstrates that "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."

---

[6] The Court will not consider Koul's breach of implied contract theory because he raised it, improperly, for the first time in his opposition to summary judgment papers. *See Lyman v. CSX Trans., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010) (summary order) (finding that district court need not consider claims raised for the first time in opposition to summary judgment).

8

FED. R. CIV. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is material if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248. A genuine issue of material fact exists only if the record, taken as a whole, could lead a reasonable trier of fact to find in favor of the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the court must view all ambiguities and inferences that may be reasonably drawn from the facts in the light most favorable to the non-moving party, *see Anderson*, 477 U.S. at 255. To defeat a motion for summary judgment, the non-moving party cannot rely "on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). Rather, the nonmoving party must offer "some hard evidence showing that its version of the events is not wholly fanciful[.]" *Miner v. Clinton Cty., New York*, 541 F.3d 464, 471 (2d Cir. 2008).

**2. <u>Analysis</u>**

The Court will first address the University's argument that Koul's contract claim is not judicially cognizable, which is based on the New York Court of Appeals decision in *Maas v. Cornell*, 94 N.Y.2d 87 (1999). (Dkt. # 36-5 at 24-25). In *Maas*, several students brought sexual harassment claims against a tenured professor. *Id.* at 90. After the university resolved those claims and disciplined the professor, the professor sued, alleging that the university breach its contract with him because it failed to follow internal procedures for dealing with sexual harassment claims. *Id.* The professor argued, "[w]ithout reference to an express contractual

9

source," that the relevant procedures "form[ed] the basis for implying an agreement" between he and the university. *Id.*

The court held that based on the parties' employment relationship, the university's "adherence to its own internal procedures d[id] not qualify for judicial cognizance." *Id.* at 92. The court relied on the policy that academic institutions are "better suited to make relatively final decisions concerning wholly internal matters," and that Article 78 of the New York Civil Practice Law and Rules ("CPLR") was the "appropriate vehicle" for "dealing with and reviewing controversies involving colleges and universities." *Id.* The court also stated, "when litigants fail to avail themselves of [Article 78], courts may justifiably dismiss plenary claims premised upon alleged failures to follow applicable principles set forth in employee handbooks." *Id.*

Several courts have applied this reasoning in dismissing claims where, although styled as a breach of contract, a faculty member brings claims based on a university's failure to follow internal policies and procedures. For example, in *Byerly v. Ithaca College*, 290 F. Supp. 2d 301, 305 (N.D.N.Y. 2003), *aff'd*, 113 F. App'x 418, 420-21 (2d Cir. 2004) (summary order), plaintiff sought to add a contract claim to her discrimination complaint related to the denial of tenure. Plaintiff alleged that the faculty handbook and department guidelines were incorporated into her employment contract, and that, in denying her tenure application, the university had committed procedural violations. *Id.* at 304-05. In holding that the proposed claim was futile, the court stated, "claims based upon the rights and procedures found in college manuals, bylaws and handbooks may only be reviewed by way of an Article 78 proceeding in New York State Supreme Court." *Id.* (citing *Maas*, 94 N.Y.2d at 92-93).

Similarly, in *Bickerstaff v. Vassar College*, 354 F. Supp. 2d 276, 283 (S.D.N.Y. 2004), *aff'd*, 160 F. App'x 61, 63 (2d Cir. 2005) (summary order), plaintiff alleged the college violated

its governing rules when the president and dean "refused to mediate the [p]laintiff's intra-collegiate harassment complaint and dismissed [her] grievance without further investigation." *Id.* The court granted the college's summary judgment motion, finding that because plaintiff based her claim on the college's adherence to its own procedures, she should have pursued an Article 78 proceeding. *Id.* at 283. (citing *Byerly*, 290 F. Supp. 2d at 304-05).

Furthermore, in *Chao v. Mount Sinai Hospital*, 476 F. App'x 892, 895-96 (2d Cir. 2012) (summary order), the Second Circuit affirmed the dismissal of plaintiff's breach of contract claim, which plaintiff based on the medical school's alleged failure to follow internal policies and procedures when it terminated plaintiff. The court assumed that the medical school employed plaintiff pursuant to an enforceable contract, and that its faculty handbook governed the employment contract. *Id.* at 895. However, because the contract claim turned on rights and procedures found in the handbook, "New York law require[d] [plaintiff] to bring his breach of contract claims in an Article 78 Proceeding rather than in federal court." *Id.* at 896.

At the same time, however, "Article 78 is not the exclusive remedy for all relief sought against a college. A cause of action based on a contract may be brought (and sometimes can *only* be brought) in an action at law rather than an Article 78 proceeding." *Romer v. Bd. of Trs. of Hobart & William Smith Colls.*, 842 F. Supp. 703, 707 (W.D.N.Y. 1994). To determine whether Koul's claim is judicially cognizable in this Court, then, it necessary to address whether Koul has "truly stated a contract claim, or whether he is seeking the type of judicial review of [the University's] actions which should more appropriately be pursued in an Article 78 proceeding." *Id.*

In *Romer*, plaintiff had a renewable contract for a definite term of employment. *Romer*, 842 F. Supp. at 707 n.4. Plaintiff sued the college when he was denied tenure, alleging that the

11

college failed follow the proper procedures and considered improper information during his tenure review, both of which violated terms in the college handbook. *Id.* at 706. The court held that even assuming the college was bound by the terms of the handbook, plaintiff still did not have a breach of contract claim, and that the claim "could only be sought in an Article 78 proceeding." *Id.* at 710. Crucial to this determination was that the terms at issue "lack[ed] the kind of clear-cut limitation on the [c]olleges' discretion in the tenure review process that would give [plaintiff] the contractual rights he attempts to assert here." *Id.* at 708. In other words, the relevant terms did not "expressly state that tenure review must invariably follow a specific, rigid procedure, or that a tenure decision could be invalidated if any variations in the procedure occurred." *Id.* at 710; *see also Rougaiel v. Ithaca Coll.*, 241 A.D.2d 865, 867 (3d Dep't 1997) (no breach of contract claim where college allegedly "failed to follow certain rules governing the tenure review process, as there [was] no express provision in the [f]aculty [h]andbook that such failure limits the [c]ollege's discretion in granting tenure").

Here, the gist of Koul's contract claim is that the University owed him certain obligations by virtue of the policies and procedures contained in the Handbook and Regulations. Like in *Romer*, the Court finds it significant that no terms limited the University's discretion in deciding whether to renew Koul's appointment. Indeed, at oral argument, Koul's counsel conceded that Koul did not have a right to be reappointed to his faculty position, implicitly recognizing the University's discretion in making such a decision.[7] So while Koul, as a faculty member, had the right to utilize the University's general grievance procedure for decisions on reappointment,

---

[7] Moreover, relevant provisions of the Handbook and Regulations support this conclusion. The Regulations only indicate that a term-appointed faculty member like Koul is entitled to two-months' notice if reappointment is not recommended. (Dkt. # 40-7 at 25). On the other hand, the Regulations state that term appointments may be only "revoked" or "abrogated" "for cause, academic cause, or financial exigency of the School or University, in accordance with procedures outlined in the [Handbook]." (*Id.* at 31; Dkt. # 40-5 at 38-39). Koul admits that he was not "terminated," and thus, no procedure, beyond sufficient notice, was mandated prior to the University's decision not to renew Koul's appointment.

12

(Dkt. # 40-5 at 37-38), and to review his personnel records, (*id.* at 49-50), neither of those terms suggests that the University's ultimate decision on Koul's reappointment could be invalidated if it did not follow those terms.

Thus, even assuming that the Handbook and Regulations governed Koul's employment contract, the terms detailing access to personnel records and the general grievance procedure lack the kind of "clear-cut limitations" on the University's discretion in renewing Koul's appointment "that would give [Koul] the contractual rights he attempts to assert here."[8] *See Romer*, 842 F. Supp. at 708.

In the absence of such limitation on the University's discretion, Koul has not stated a breach of contract claim. *Cf. Langenkamp v. Olson*, 628 F. App'x 50, 52 (2d Cir. 2015) (summary order) (finding, at the pleading stage, that terminated professor sufficiently pled a contract claim based on procedures in the faculty handbook, where the provisions of the handbook were contractual and specified procedures the university was required to follow before terminating the professor, and it was undisputed the university failed to follow any of those provisions). Therefore, the Court finds that Koul's claims are more appropriately considered in the Article 78 context, as he is essentially arguing that the University's decision not to renew his appointment "was arbitrary and capricious or an abuse of discretion." *See Romer*, 842 F. Supp. at 707; *see also Byerly*, 290 F. Supp. 2d at 305 ("Essentially, [p]laintiff is asserting that

---

[8] Koul's claim that the University did not follow its "Policy against Discrimination and Harassment" does not state a viable breach of contract claim. *See Lai v. Deiorio Foods Inc.*, No. 15-cv-0195, 2016 WL 814930, *7 (N.D.N.Y. Feb. 29, 2016) ("It is well-established that an employer's antidiscrimination policies and manuals cannot serve as the basis for a breach of contract claim."); *see also Kearney v. Pyramid Mgmt. Grp., Inc.*, No. 98-cv-0531, 2000 WL 744000, *8 (W.D.N.Y. June 5, 2000) ("even if [defendant] did terminate [plaintiff] because of his race, such does not constitute a breach of contract"). The court in *Kearney* noted that this conclusion did not preclude plaintiff from bringing, as Koul did here, causes of action for discrimination under state or federal anti-discrimination statutes. *See Kearney*, 2000 WL 744000 at *8 n.11.

13

[d]efendant's failure to follow the procedures outlined in [internal] documents constituted an abuse of discretion.").

Because Koul failed to avail himself of Article 78, his current plenary contract claim "premised upon alleged failures to follow applicable principles" set forth in the University's Handbook and Regulations is dismissed. *See Maas*, 94 N.Y.2d at 92. Moreover, as Koul did not, and cannot now, timely pursue that avenue, his claim must be dismissed as untimely. *See, e.g., Bickerstaff*, 354 F. Supp. 2d at 283 ("The Article 78 proceeding has a four month statute of limitations and the [p]laintiff never initiated Article 78 proceedings in this case. Thus, [plaintiff's claims] . . . should be dismissed"); *Romer*, 842 F. Supp. at 710 ("Since [an Article 78 proceeding] was not timely pursued and is now precluded by the statute of limitations, the first cause of action must be dismissed.").

## CONCLUSION

For the above-stated reasons, the University's motion for summary judgment (Dkt. # 36) is **GRANTED**. Koul's Complaint, therefore, is **DISMISSED** in its entirety and with prejudice.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
January 25, 2018.